2010 Ark. App. 366

**Juanita P. BOOTH, Individually and as Personal Representative of the Estate of Patrick Booth, Appellants**

v.

**RIVERSIDE MARINE REMANUFACTURERS, INC., Appellee.**

No. CA 09–887.

Court of Appeals of Arkansas.

April 28, 2010.

Supplemental Opinion on Denial of Rehearing June 16, 2010.

Elizabeth Robben Murray, H. Wayne Young, Jr., Friday, Eldredge & Clark, Little Rock, for appellant.

John E. Tull III, E.B. Chiles IV, Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock, Brandon B. Cate, Quattlebaum, Grooms, Tull & Burrow PLLC, Springdale, for appellee.

DAVID M. GLOVER, Judge.

For the third time, this breach-of-contract case is before us.[1] As with the previous appeals, the issue concerns appellee Riverside Marine Remanufacturers, Inc.'s liability to provide health insurance to appellants Patrick Booth (Pat) and Patsy Booth (Patsy) under a consulting agreement between Pat and Riverside.[2] Following the latest remand, the circuit court found that Riverside did not breach its obligations to the Booths. In the present appeal, Patsy argues that the circuit court erred in (1) violating the mandate from this court in the most recent appeal, (2) finding that Riverside did not breach the parties' agreement, and (3) awarding Riverside attorney's fees. We affirm.

## 1. Booth I & II

The following background is drawn from Booth I, our first opinion.

Pat founded Riverside in the 1970s and was its majority shareholder. [His son] Tom was the only other shareholder. In August 2001, Pat entered into a stock purchase agreement with Riverside and Tom whereby he would sell 169 shares to Tom. Riverside would redeem another 120 shares. Also as part of the sale, Pat and Riverside entered into a consulting agreement which provided, inter alia, that Pat would receive "[c]ompany paid health insurance for he and his wife and such health insurance shall continue for the life of [Pat] and the life of [Pat's] wife, Patsy Booth."

The consulting agreement further provided that it would expire upon Pat's death, provided that Riverside would continue health insurance coverage for Patsy until her death. The consulting agreement was specifically mentioned in the stock purchase agreement and incorporated by reference therein.

In July 2002, Riverside's insurance agent, with Tom's approval, wrote a letter to Pat, stating that, because Pat was

1. *Riverside Marine Remfrs., Inc. v. Booth*, 93 Ark. App. 48, 216 S.W.3d 611 (2005) (*Booth I*); *Booth v. Riverside Marine Remfrs., Inc.*, CA07–119, 2007 WL 3378571 (Ark.App. Nov. 14, 2007) (unpublished) (*Booth II*).

2. Pat died on May 15, 2009, shortly after the notice of appeal was filed with the circuit court. On September 30, 2009, this court granted Patsy's motion to substitute herself as personal representative of Pat's estate.

not a full-time Riverside employee, it was illegal under federal law to carry him on Riverside's group policy. The letter also suggested alternative coverages. On February 20, 2003, Tom notified Riverside's insurance carrier that, effective March 1, 2003, Pat and Patsy were to be dropped from the group policy. Pat and Patsy obtained other coverage, for which Riverside has continued to pay.

Pat and Patsy filed suit against Riverside in August 2003, alleging that Riverside had breached the consulting agreement by providing less favorable benefits. The complaint sought damages for their additional out-of-pocket expenses, together with specific performance of the consulting agreement. In the alternative, they sought reformation of the consulting agreement. Riverside answered, denying that it had breached the consulting agreement and stating that the agreement required only that it provide health coverage, not group coverage.

93 Ark.App. at 49–50, 216 S.W.3d at 612–13.

In *Booth I,* we reversed a judgment in favor of the Booths on the basis that the circuit judge had made certain comments indicating that he had decided the matter prior to the presentation of all of the evidence. In *Booth II,* we reversed a summary judgment in favor of Riverside, holding that the parties' agreement was ambiguous, and remanded the matter for trial.

## 2. *Booth III*

Following *Booth II,* on remand, the parties entered into a stipulation of facts, and agreed that the circuit court could decide the matter on the transcript of the original bench trial of *Booth I.*

At the time of the sale and for approximately a year thereafter, Riverside provided health insurance for Pat and Patsy under Riverside's group health plan with Aetna U.S. Healthcare, with Pat as an employee and Patsy as his spouse. At that time, Pat was also covered by Medicare Parts A & B at his own expense and a Medicare supplement, paid for by Riverside. The Aetna policy had a $500 deductible per person and paid for prescription drugs after co-payments. The Aetna policy also paid for certain wellness costs such as pap smears, mammograms, physicals, and routine lab tests.

Riverside continued to pay for Pat's Medicare supplement. In December 2002, after the Booths had been informed that they could no longer be covered under Riverside's group policy and while Patsy's application for individual health insurance was pending, she had a heart attack. She thereafter obtained coverage in the State's Comprehensive Health Insurance Pool ("CHIP"). Since March 2003, Riverside has paid the CHIP premium for coverage of Patsy. The insurance coverage and benefits Pat and Patsy had after March 2003 were inferior to the coverage and benefits they both had under Riverside's group policy because they are not as comprehensive as those provided under the group policy. From the termination of the Aetna coverage in 2003 through November 2008, Pat and Patsy had incurred $33,758.69 in out-of-pocket costs they would not have otherwise incurred if they still had coverage at the same level as the Aetna group policy. The primary sources of these out-of-pocket costs were increased deductibles, paying for prescription drugs that had previously been covered by insurance, and paying for the preventive and wellness care that was no longer covered under the Booths' new health insurance.

Doug Coy, the attorney representing Pat in the transaction, testified that Pat told him that the continuation of his salary and health insurance for him and his wife were "material" considerations in the sale. He also testified that his notes from a July 2001 meeting with Pat referenced a discussion on the health insurance and indicated "at or above existing," meaning that the health insurance in place at the time would be the minimum coverage provided for Pat and Patsy. Coy stated that the consulting agreement referred to "company paid health insurance." He also stated that there was a discussion of whether insurance policies could include consultants if the consultant met a certain level of work but said that he ultimately considered this a "buyer's issue," meaning that it was Riverside's option as to how to meet this obligation. He testified that he sent Virgil Young, the attorney representing Tom in the transaction, a typed copy of his notes concerning the transaction showing that he sought to have the health-insurance coverage specified but that Young did not want to specify a level of benefits and wanted to preserve as much flexibility as he could. However, he said that Young never objected to the level of benefits remaining the same. Coy said that they had discussed the issue and concluded that the language actually used was sufficient to address the issue while giving Riverside the flexibility it wanted to provide that same benefit in a manner of its choosing.

On cross-examination, Coy stated his opinion, based on the discussions he had with Young as well as the discussions between Pat and Tom, was that the language of the consulting agreement was unambiguous that Pat was to receive insurance benefits at or above the same level as then in effect. He could not recall whether the phrase "at or above existing" originated with Pat or himself. Although he acknowledged that there were no documents confirming that the parties had agreed to continue the insurance coverage at the same level of benefits, Coy contended that the correspondence between him and Young indicated that the parties came to an agreement on the issue. According to Coy, the change from an employment agreement to a consulting agreement was brought about because of concerns about favorable capital-gains treatment for Pat, but that he did not research the effect of such a change on Pat's insurance coverage.

Brian Findley, the certified public accountant who advised Tom during the transaction and was Pat's personal accountant, stated that he had individual discussions with Pat about his expectations of the consulting agreement and was informed that Pat wanted health insurance to continue for him and his wife. Findley said that Pat never mentioned any particular level of benefits or type of coverage and that he was not asked to review the issue by Tom or Riverside. He also stated that Pat expressed his desire to be able to remain on the group insurance plan.

Tom Booth testified that he offered to buy his father out on numerous occasions but was refused. In 2001, he offered to buy the company from Pat for $1 million and provide Pat with a continuation of his salary and health insurance. He said that he did not discuss with his father any particular type of company-paid health insurance to be provided because he did not consider it to be an issue. He testified that he later agreed during negotiations to provide coverage for Patsy. He stated that neither he nor Pat discussed whether the coverage would be the same or better than the group plan in effect in 2001. He explained that his father was past sixty-five years of age and receiving Medicare benefits, and that Riverside paid for Pat's Medicare supplement policy. Tom stated that he did not discuss with either his

attorney or with Riverside's insurance agent prior to the sale whether the policy would provide a certain level of benefits. He also never asked his insurance agent to see whether there were any gaps in the coverage provided to Pat or Patsy, whether they could obtain other types of insurance, or what additional costs they may have incurred as a result of not being covered under the group policy.

According to Greg Hatcher, Riverside's insurance agent since the early 1990s, Pat could not be a consultant and remain on the group policy. He also said that the consulting agreement did not require Pat to remain on the group plan. Hatcher compared the coverages Pat and Patsy had in 2001 and the coverages that they currently had and concluded that Pat's coverage was better because he was on Medicare and had a Medicare supplement policy. He also stated that Pat already had the best prescription-drug coverage offered by Blue Cross. As for Patsy, Hatcher stated that he attempted to obtain an individual policy for her but was declined by Blue Cross and another insurer. He stated that he was able to obtain a policy for her through CHIP but that the premiums and deductibles were much higher. He was also not certain whether the CHIP policy covered mammograms or routine physicals.

Patsy Booth testified that the sale to Tom occurred after Tom came to her home and discussed the matter with Pat. She said that Tom told her directly that he had made an offer for the company that included health insurance for Pat and her. She acknowledged that, since the sale in August 2001, she has continuously had health coverage. She said that the insurance coverage Riverside was providing at the time of trial was not the same as that in July 2001 because there were higher co-payments and out-of-pocket expenses. On re-direct examination, she said that she testified in her deposition that Tom had told her that he would continue to pay for health insurance until they (Pat and Patsy) died.

Pat Booth testified that he had many health problems, including high blood pressure, losing a lung to cancer, taking a great deal of medication, and using oxygen all the time. He was interested in selling the business in 2001 because of his health and because he was tired of working. He stated that Tom offered him $1 million, a continuation of his salary, and company-paid health insurance for him and his wife for the rest of their lives, and that Tom said he would take care of it and that it would be at the same level of benefits as he had enjoyed. According to Pat, he never discussed whether he would be an employee or a consultant; instead, he left that issue to the attorneys to negotiate. He also stated that he did not insist on including a specific provision of the policy but later stated that he insisted that it be group coverage. Pat said he hired Doug Coy and told Coy that he wanted health insurance for himself and Patsy for the rest of their lives equal to or better than what they had. He did not recall Coy sending him the various drafts during the negotiations. He also said that he read the documents prior to closing but did not specifically look to see if the consulting agreement contained language indicating that the coverage would be equal to or better than the existing coverage. He also noticed that the language he used with Coy about the level of benefits was not in the version of the document he signed. Pat acknowledged that Riverside has continued to pay for his Medicare supplement and for Patsy's CHIP policy; however, Riverside has not been paying the out-of-pocket expenses.

Virgil Young testified that he had discussions with Tom in May 2001 concerning the sale and thereafter began corresponding with Doug Coy, the attorney representing Pat. He said that Coy specifically told him that Pat wanted a consulting agreement. Although Young acknowledged having a discussion with Coy about Pat remaining on the Aetna group policy, he denied having any discussions about the health benefits being equal to or greater than the existing policy or receiving a copy of Coy's notes regarding the discussions. He also said that it would have been easy to specify that the coverage would remain the same. Young stated that, if Coy had insisted on a provision that Pat and Patsy could remain on the group policy, he would have advised Tom not to execute the agreement. According to Young, paragraph three of the consulting agreement did not continue the health insurance that was in place as of the closing. Instead, the agreement stated that a policy would be purchased in connection with the agreement and that it would remain in place for the lives of Pat and Patsy. He denied that the Aetna policy in place at the time would be the benchmark for future coverage. Young said that the language used did not give Riverside unfettered discretion as to the benefits it provided to Pat and Patsy.

On March 19, 2009, the circuit court entered its findings of fact and conclusions of law. The court set forth the chronology of the negotiations between the attorneys for Pat and Tom and found that, although Pat expressed his desire that the health-insurance coverage remain the same as the Aetna group policy then in force, he signed the agreement without the additional requested changes being made. Riverside was also found to have paid for health insurance for Pat and Patsy since the execution of the consulting agreement. Based on these findings, the court concluded that Riverside had not breached its obligation and was entitled to judgment on Pat and Patsy's complaint. The court entered judgment dismissing the Booths' complaint with prejudice on the same day. Riverside was later awarded $41,814.50 in attorney's fees and $120 in costs.

On April 2, 2009, Patsy filed a motion seeking to alter or amend the judgment. The motion asserted that the court failed to rule on many of the disputed issues such as the meaning of the ambiguous phrase at issue, what level of benefits the parties intended, and the effect of the phrase "such health care shall continue." The motion was denied by order entered on April 13, 2009.

A timely notice of appeal was filed from the judgment, the denial of the motion to alter and amend the judgment, and the award of attorney's fees.

### 3. Standard of Review

In bench trials, the standard of review on appeal is not whether there is any substantial evidence to support the finding of the court, but whether the court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Roberts Contracting Co., Inc. v. Valentine–Wooten Road Public Facility Bd.*, 2009 Ark.App. 437, 320 S.W.3d 1. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a firm conviction that a mistake has been committed. *Id.*

### 4. Points on Appeal

In her first point, Patsy argues that the circuit court violated this court's mandate from *Booth II* in several particulars. We disagree with Riverside's argument that the issue is not preserved for appeal. Although Patsy did not specifical-

ly use the term "law of the case," she argued in both her trial brief and in her motion to alter or amend the judgment that the court was required to determine the parties' intent, including the level of benefits the parties intended. We believe that this was adequate to preserve the point.

Contrary to Patsy's argument, it is implicit that the circuit court found that the parties did not agree to specify a certain level of health-insurance benefits in their agreement; otherwise, the court could not have concluded that Riverside was not in breach of the agreement. Riverside was not obligated to prove the level of benefits the parties intended. The burden was upon the Booths as the plaintiffs to prove their allegation that Riverside breached the consulting agreement. Nor was it necessary for the circuit court to determine what level of benefits the parties intended to provide because the court was only asked to determine whether Riverside breached its obligation to provide health insurance to the Booths at the same level or better than the group policy in force at the time of the transaction. The court made that determination.

For her second point, Patsy argues that the circuit court erred in finding that Riverside was not in breach of its obligation under the agreement to provide health insurance. She argues that the decision is against the preponderance of the evidence. In *Connelly v. Beauchamp*, 178 Ark. 1036, 13 S.W.2d 28 (1929), the court stated the rule as follows:

> The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, if it can be done consistently with legal principles. The parties should always be bound for what they intended to be bound for, and no more. The intention of the parties means, how-

ever, the intention as shown by the contract, and not what they may have had in mind but did not express. The law presumes that the parties understood the import of their contract and that they had the intention which the terms of the contract manifest.

178 Ark. at 1042, 13 S.W.2d at 30. *See also Rodgers v. Lyon,* 256 Ark. 323, 507 S.W.2d 95 (1974). Because the agreement in this case was ambiguous, its meaning was a question of fact for the circuit court sitting as the fact-finder. *First Nat'l Bank v. Griffin,* 310 Ark. 164, 832 S.W.2d 816 (1992).

We cannot say that the circuit court was clearly erroneous in determining that Riverside did not breach the consulting agreement. There was testimony that Pat Booth wanted the coverage to continue at the same level as the Aetna group plan and testimony from Tom that could be construed as agreeing to pay for whatever coverage Pat had at the time of the sale. There were also discussions between the parties' attorneys as to whether the level of benefits would be as good as or better than the coverage then in place. However, Tom also testified that neither he nor Pat ever made a statement that the coverage would be as good as the Aetna plan. The fact is that the documents were not changed to provide that the coverage would be equal to or better than the then-existing coverage, and Pat Booth and his attorney were made aware that the documents had not been changed. This indicates that Riverside ultimately did not agree to the change. Pat nevertheless executed the agreement. As Virgil Young testified, it would have been a simple matter to specify that the benefits would remain at the same level if that is what the parties agreed upon. The intention that matters is the intention expressed in the contract, not what the parties may have

had in mind but did not express. *Connelly, supra.* Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. *Rymor Builders, Inc. v. Tanglewood Plumbing Co.,* 100 Ark.App. 141, 265 S.W.3d 151 (2007).

Finally, there is no merit to Patsy's suggestion that this court should reverse and enter judgment in her favor because the equities are tilted in her favor. First, there is no basis for a reversal. Second, this is a law case, not an equity case. All of the cases she cites in support of this argument are equity cases. In equity cases our review is de novo, and that is the basis for the rule. The ordinary procedure in reversing judgments in law cases is to remand for another trial. *JAG Consulting v. Eubanks,* 77 Ark.App. 232, 72 S.W.3d 549 (2002).

In her third and final point, Patsy argues that the circuit court erred in awarding Riverside its attorney's fees. A circuit court is not required to award attorney's fees, and we usually recognize the superior perspective of the circuit judge in determining whether to award attorney's fees. *Jones v. Abraham,* 341 Ark. 66, 15 S.W.3d 310 (2000); *Chrisco v. Sun Indus., Inc.,* 304 Ark. 227, 800 S.W.2d 717 (1990). Section 16–22–308 has been held to authorize an award of attorney's fees to a party who successfully defends against a contract claim. *Meyer v. Riverdale Harbor Mun. Prop. Owners Improvement Dist. No. 1 of Little Rock, Ark.,* 58 Ark.App. 91, 947 S.W.2d 20 (1997); *Cumberland Fin. Group, Ltd. v. Brown Chem. Co.,* 34 Ark. App. 269, 810 S.W.2d 49 (1991).

Patsy's argument is that Riverside is not entitled to any fees for work done on the two prior appeals or for any work done prior to *Booth II.* However, Patsy did not raise this argument to the circuit court. It is well settled that this court will not con-

sider arguments raised for the first time on appeal. *See Seth v. St. Edward Mercy Med. Ctr.,* 375 Ark. 413, 291 S.W.3d 179 (2009).

Affirmed.

VAUGHT, C.J., and GRUBER, J., agree.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

DAVID M. GLOVER, Judge.

On April 28, 2010, we handed down an opinion in this case that affirmed the circuit court in all respects. *Booth v. Riverside Marine Remfgrs., Inc.,* 2010 Ark. App. 366, 376 S.W.3d 450. One of the points on appeal was the circuit court's decision to award appellee approximately $41,000 in attorney's fees. This issue is the subject of the petition for rehearing. We deny rehearing but issue this supplemental opinion to address appellants' argument on rehearing.

On appeal, appellants argued that appellee was not entitled to any attorney's fees for work performed on the two prior appeals in this case or for work prior to the second appeal. We held that the argument was not preserved for review because it had not been presented to the circuit court. 2010 Ark. App. 366 at 13, 376 S.W.3d at 458. In their petition for rehearing, appellants assert that their argument was presented to the circuit court in their brief in support of their response to appellee's motion for fees. This brief was, as appellants acknowledge, not included in their addendum. Nevertheless, appellants argue that we should review their argument on the attorney's fee issue on the merits because the brief was not *required* to be included in the addendum by the version of Supreme Court Rule 4–2(a)(8)(A) that was in effect at the time

appellants filed their brief.[1] We must decline the invitation.

It is the appellants' burden to bring up a record sufficient to demonstrate error. *Judkins v. Duvall*, 97 Ark.App. 260, 248 S.W.3d 492 (2007). With the exception of materials included in the addendum, the record on appeal is confined to that which is abstracted. *Huddleston v. State*, 339 Ark. 266, 273, 5 S.W.3d 46, 50–51 (1999). We will not examine the transcript of a trial to reverse a circuit court, although we will do so to affirm. *Greene v. Pack*, 343 Ark. 97, 32 S.W.3d 482 (2000). Although Rule 4–2(a)(8) may not have required appellants to include their brief in the addendum, there was nothing preventing them from doing so. Moreover, including the brief in the addendum would have facilitated our understanding of the issue and enabled us to see that the issue had been properly preserved.

Rehearing denied.

VAUGHT, C.J., GLADWIN, ROBBINS, KINARD, and GRUBER, JJ., agree.

---

**1.** Rule 4–2(a)(8)(A) was amended effective January 1, 2010, to require briefs relating to motions to be included in the addendum. *See In re Arkansas Supreme Court and Court of Appeals Rules 4–1, 4–2, 4–3, 4–4, 4–7, and 6–9,* 2009 Ark. 534 (per curiam).